UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| HENRY WILLIAM DEMPSEY, JR., | Case No. 3:21-cv-00302-MMD-CSD |
| Petitioner, | ORDER |
| v. | |
| NETHANJAH BREITENBACH,[1] *et al.*, | |
| Respondents. | |

## I.    SUMMARY

Petitioner and Nevada state prisoner, Henry William Dempsey, Jr., filed a counseled Second Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 25 ("Petition").) This matter is before the Court for adjudication on the merits of the remaining grounds[2] in the Petition. The Court denies the Petition and denies a Certificate of Appealability ("COA").

## II.    BACKGROUND

### A.    Facts Underlying the Convictions[3]

On July 15, 2013, the Washoe County Sheriff's Department was dispatched to a local residence based on allegations of sexual assault on two minors. (ECF No. 38-1 at 5.) Upon arrival, deputies contacted Washoe County Social Services ("CPS") who related

---

[1]According to the state corrections department's inmate locator page, Dempsey is currently incarcerated at Lovelock Correctional Center ("LCC"). Nethanjah Breitenbach is the warden of that facility. The Court directs the Clerk of Court to substitute Nethanjah Breitenbach for Respondent Warden Garrett under Fed. R. Civ. P. 25(d).

[2]The Court found Ground 1 unexhausted and dismissed that ground at Dempsey's request. (ECF Nos. 50 at 9; 53.)

[3]Unless otherwise noted, the facts underlying the convictions are derived from the Presentence Investigation Report. (ECF No. 38-1.)

a five-year-old girl told a school employee that her father and brother were sexually assaulting her and her eight-year-old sister. (*Id.*)

According to the school employee, the five-year-old asked the employee if she could tell a secret without the employee telling the police or CPS. (*Id.*) The employee stated she could, and then the five-year-old said, "they do us . . . they fuck us." (*Id.*) The five-year-old clarified "they" included Henry "Hank" Dempsey, and her father. (*Id.*) The five-year-old pointed to her vagina and said, "they put their dicks in there." (*Id.*) The five-year-old stressed the importance of not telling anyone the secret because "Hank will . . ." and made a motion dragging her hand across her throat in a cutting motion. (*Id.*)

The five-year-old told the school employee that while one of the two victims was being sexually assaulted the other would watch and stated, "we like to watch." (*Id.*) The five-year-old told the employee that Dempsey and her father alternated the sexual assaults and never acted together because "their dicks are too big for our pussy." (*Id.*) The five-year-old explained that Dempsey and her father "fuck" them on some occasions and "rape" them on other occasions. (*Id.*) The victim stated, "rape" is "if they push it hard and it makes us scream . . . the fucking is just when it doesn't make us scream." (*Id.*)

The children were transported to the Sheriff's Department where Deputies interviewed them. (*Id.*) The five-year-old described sexual acts to which Dempsey subjected her, including cunnilingus, penile/vaginal intercourse, penile/anal intercourse, and digital penetration. (*Id.*) She stated Dempsey would only stop "when he gets out and then starts squirting white stuff inside." (*Id.*) She said he "squirted the white stuff in "her" pee pee." (*Id.*) She also stated she observed Dempsey sexually assaulting her eight-year-old sister and that it last occurred the night before the interview. (*Id.*) The eight-year-old confirmed the allegations related by her sister. (*Id.*) The victims were diagnosed with sexually transmitted disease. (*Id.* at 7.)

On July 16, 2013, Dempsey was interviewed at the Washoe County Sheriff's Department. (*Id.* at 5.) He initially denied any instances of sexual abuse, but as the interview progressed, admitted touching the victims' vaginas, digitally penetrating the

victims, rubbing his penis on the victims' vaginas, and ejaculating in front of the victims on numerous occasions, including ejaculating on them. (*Id.*) He stated the acts began about six months before the interview and the last time was the previous night. (*Id.*) Although Dempsey admitted the offenses, he continually blamed the children. (*Id.*)

### B.    Pre-Plea Competency Proceedings

On July 19, 2013, a complaint in Nevada Justice Court charged Dempsey with four counts of sexual assault on a child and four counts of lewdness with a child under the age of fourteen years in connection with his sexual activity with the five-year-old and eight-year-old girls. (ECF Nos. 31-2; 31-8.)

On September 26, 2013, the Justice Court ordered a competency evaluation. (ECF No. 31-4.) At a hearing on October 31, 2013, the state district court received two evaluations, found Dempsey competent to stand trial and to aid counsel in preparation of that trial, and returned the matter to Justice Court for further proceedings. (ECF Nos. 31-1 at 2; 31-5 at 4; 31-6.)

### C.    Guilty Plea Agreement and Entry of Guilty Pleas

At his arraignment in the Justice Court on April 3, 2014, Dempsey signed a waiver of preliminary examination based on his agreement to remand to the state district court, where he would plead guilty to three counts of lewdness with a child under the age of fourteen years, naming both victims for each count and stipulate to consecutive sentences. (ECF No. 31-10 at 2.) In exchange, the State agreed to dismiss and not pursue charges of child sexual assault or other transactionally related charges alleged in the police reports and complaint or seek enhancement of sentence. (*Id.*)

On April 17, 2014, Dempsey signed a guilty plea memorandum ("GPM") consistent with the terms expressed on his waiver of preliminary examination. (ECF No. 31-13 at 2-8.) By virtue of signing the GPM, Dempsey acknowledged he was ineligible for probation and that he could be sentenced for ten years to life for each count, and the parties stipulated to consecutive sentences; but he also acknowledged he understood the Court

was not bound by the parties' agreement and the sentence was determined solely by the court. (*Id.* at 5-7.)

According to the GPM, Dempsey acknowledged his plea was offered "freely, voluntarily, knowingly and with full understanding of all matters set forth in the Information and in the [GPM]." (*Id.* at 7.) He acknowledged "My plea of guilty is voluntary and is not the result of any threats, coercion or promises of leniency." (*Id.*) He further acknowledged, "I am signing this Plea Memorandum voluntarily with advice of counsel, under no duress, coercion, or promises of leniency." (*Id.* at 8.) Defense counsel explained to the state district court the terms of the plea agreement, including Dempsey's stipulation that his sentences run consecutively, and stated that Dempsey understood that the final decision is up to the judge. (ECF No. 31-14 at 4-5.)

The state district court canvassed Dempsey, who confirmed that he understood the plea negotiations and had no questions about them. (*Id.*) He confirmed he was comfortable with the representation received from his lawyer. (*Id.*) He confirmed he read, understood, and signed, the GPM, and had no questions about it. (*Id.*) He acknowledged he was aware that he had, and was giving up, the rights to plead not guilty, have a jury trial, be confronted by the witnesses against him, bring witnesses on his own behalf, and testify or not testify at that jury trial. (*Id.* at 5-6.) He confirmed he understood he had, and was giving up, the rights against self-incrimination, that he was entitled to assert that right by refusing to testify, and that the State must prove him guilty beyond a reasonable doubt. (*Id.*)

Dempsey also confirmed that his counsel explained the possible maximum penalty for the offenses and he understood he was not eligible for probation and could be sentenced to ten years to life imprisonment for each conviction, for a minimum of "30 years in prison." (*Id.* at 8-9.) Dempsey confirmed no one made any threats to get him to enter the pleas, no one made any statements to get him to enter the pleas that he did not tell the court about, and he had no basis for entering the pleas other than that he

4

1  committed the offenses charged and decided to go forward and enter the pleas of his own

2  free will. (*Id.* at 9-10.) He agreed that he was not guaranteed a particular result. (*Id.*)

3      The three charges alleged in the Information, including the details of the lewd acts

4  perpetrated against the victims, was read aloud to Dempsey in open court. (*Id.* at 6-7.)

5  Dempsey confirmed he understood the charges and he "did" what the charges alleged he

6  did in each of the three counts. (*Id.* at 8.) Dempsey entered guilty pleas to all three counts

7  and the state district court accepted the pleas after finding that Dempsey fully understood

8  the nature of the offense and the consequences of his pleas. (*Id.* at 10-11.) The matter

9  was scheduled for sentencing. (*Id.* at 11-12.)

10     According to the June 10, 2014, Presentence Investigation Report ("PIR"),

11  Dempsey was interviewed by the Nevada Department of Public Safety Division of Parole

12  and Probation on June 2, 2014. (ECF No. 38-1 at 6.) He also provided a written statement.

13  (*Id.*) Dempsey "acknowledged culpability for the instant offense and stated that he digitally

14  penetrated the victims, touched their vaginas, rubbed his penis on their vaginas and

15  ejaculated on the victims." (*Id.*) Dempsey justified his actions by stating the older victim

16  consented to the abuse and the younger child's mother gave him permission to abuse the

17  younger child. (*Id.*) Dempsey continued to impress upon the interviewer that his actions

18  were not as heinous as the allegations against the victim's father, Herndon, and actions

19  of others in prison for the same crimes. (*Id.*) The PIR recommended a sentence of ten

20  years to life imprisonment for count 1; an identical sentence for count 2 consecutive to

21  count 1; and an identical sentence for count 3 consecutive to count 2. (*Id.* at 8.)

22     At the initial sentencing hearing on July 1, 2014, defense counsel alerted the state

23  district court that Dempsey wished to withdraw his guilty plea and the court appointed

24  new counsel for the purpose of filing a motion to withdraw the guilty plea. (ECF Nos. 31-

25  1 at 4; 31-17 at 2-3.)

26     **D.    Denial of Motion to Withdraw Guilty Plea and Sentencing**

27     Dempsey's new counsel filed a motion to withdraw his guilty plea, asserting that

28  Dempsey's pleas were not voluntary because he was inadequately represented by former

1    counsel. (ECF No. 31-18 at 3-4.) Dempsey complained that his former counsel did not

2    visit him upon request and caused additional charges to be filed against him, and that he

3    wished to voice his complaints in open court. (*Id*.) The motion stated Dempsey

4    acknowledged he signed the GPM "after discussing the document with his counsel," and

5    that "[h]is then counsel answered all his questions about the document." (*Id*.) Dempsey

6    acknowledged to his new counsel that he "reads and writes well." (*Id*.) The motion stated

7    Dempsey "read paragraphs 6 and 7 [of the GPM] aloud to [new counsel] and explained

8    them both to [new counsel] in a way that indicated he had a clear understanding of their

9    meaning." (*Id*.) Although new counsel filed the request to withdraw the guilty plea on

10   Dempsey's behalf, new counsel stated he did not endorse the motion. (*Id*.)

11          On July 31, 2014, the state district court held a motion hearing at which Dempsey,

12   under oath, addressed that court regarding his concerns. (ECF No. 31-20 at 4-5.) He

13   stated, "I don't feel that the evidence is sufficient enough and that I was wrongfully

14   accused of this." (*Id*.) Dempsey said he "constantly called" his prior counsel but counsel

15   never returned his calls, and Dempsey wanted counsel to go through the evidence

16   thoroughly, and, although former counsel told him there was other evidence, Dempsey

17   never received copies. (*Id*.) The State argued it discovered former lead counsel or the

18   defense investigator had met with Dempsey 13 times between July 30, 2013, and June

19   24, 2024 and lead and co-counsel met with Dempsey numerous times in the Justice

20   Court. Dempsey made 139 calls to counsel, although it could not be determined during

21   how many of those calls they spoke with each other. (*Id*. at 7-8.)

22          The state district court denied the motion after finding the guilty plea knowingly,

23   freely, and voluntarily entered. The district court noted that Dempsey previously told the

24   court he was satisfied with the representation of counsel for the plea, and Dempsey did

25   not demonstrate he had inadequate communication with counsel about the case:

26                THE COURT: I'm even more vigilant to make sure that the person
                 understands that it is a permanent entry of plea and that we're not going to
27               change our mind later and make sure that the person is freely and
                 voluntarily entering the plea.
28

When the penalty is significant I always make sure, and when it carries mandatory time in prison I always make sure. And I have absolutely no doubt about your plea being freely and voluntarily entered. And then when I read the transcript, it supports that sense, that it was freely and voluntarily entered; the presumption that I need to give you is what let's you withdraw your plea, unless I know truly that it was knowingly, freely and voluntarily entered.

The Guilty Plea Memorandum is very specific. You're articulate, you're educated enough to understand it. You did then. You told me you did. You still do understand it. So the Guilty Plea Memorandum, the specific canvass, and the factual issues in this case, the factual basis for the plea still being that are reasons that I would not allow you to withdraw your plea and would in fact find that it was knowingly, freely, and voluntarily entered.

I am concerned about your allegation that you didn't have enough time to speak to Mr. Leslie. I don't know how much enough time is. I never know the right answer for that. For some it's short, hardly any visits; for others it's more. But as a matter of law at this stage in the proceedings, I can't find that the 13 times in 12 months, as a matter of law, inadequate.

You told me you were comfortable with his representation when I took your plea. You didn't tell me had [sic] you had any issues. You didn't tell me that you hadn't had time to talk to him enough about it. So I have to take you for your word on that issue.

And so I am not going to reverse your plea based on Mr. Leslie not spending time with you.

I know that there is a co-offender in this case that is set for trial. I don't know how that impacts your decision now, maybe, to withdraw your plea or if that has anything to do with it. But the bottom line here is that as you freely and voluntarily gave your plea to me before. And I do not think it's appropriate, nor do I think it's in the interest of justice or fairness for me to allow you to withdraw your plea.

(*Id.* at 9-10.) Dempsey's new counsel supplemented the record, stating his opinion, "after a review of discovery in this case that the plea bargain reached in the case is in the best interest of the defendant, given the charges that the State would have gone forward with if he had not reached that bargain." (*Id.* at 10-11.) The court replied, "that's certainly entered into my thought process. I know this is a lesser, based on the statements in the presentence investigation." (*Id.*) The state court sentenced Dempsey to three consecutive sentences of ten years to life imprisonment. (ECF Nos. 31-20 at 17; 31-21.)

### E.    Postconviction Proceedings

Dempsey did not file a direct appeal. He instead filed a *pro se* state habeas petition alleging ineffective assistance of counsel and the state district court appointed postconviction counsel. (ECF Nos. 31-28; 31-32.)

7

Dempsey also filed a motion to vacate illegal sentence ("Motion to Vacate") claiming, among other things, that authorities used him to lure the true guilty party into arrest and that he was tricked and manipulated due to his mental disabilities into pleading guilty, and that he is innocent of the crimes. (ECF No. 31-37.) On June 23, 2017, the state district court denied the Motion to Vacate. (ECF No. 31-40.) The state district court observed the request "appears to be a supplement to the Petition for Writ of Habeas Corpus (Post-Conviction) previously filed by the Petitioner," and the court had appointed counsel to represent the Petitioner for that petition. (*Id.* at 2.) The court stated the motion "is referred to appointed counsel . . . who shall notice the Court that the Petition is being supplemented using the information contained in the Motion to Vacate Illegal Sentence, or otherwise, or to notice the Court of no supplement to the original petition" within 10 days. (*Id.* at 2-3.) Dempsey's new postconviction counsel filed a "Notice of No Supplement to Petition for Writ of Habeas Corpus (Post-Conviction) and Notice of No Supplement to Motion to Vacate Illegal Sentence" stating, "[t]he Petitioner's pro se Petition for Writ of Habeas Corpus (Post-Conviction) and his Motion to Vacate Illegal Sentence currently on file with the Court shall stand as filed and no supplement to the Petition or Motion shall be presented." (ECF No. 32-6 at 2.)

On January 22, 2019, the state district court held an evidentiary hearing and heard testimony from defense counsel and Dempsey. (ECF No. 32-21.) Postconviction counsel argued questions came up during Dempsey's testimony at that postconviction hearing about Dempsey's ability to understand the process and requested funds to hire an expert to investigate his cognitive abilities for the purpose of arguing for a new sentencing hearing. (*Id.* at 74-75.) The state district court granted counsel time to procure funds and an expert and heard testimony from forensic psychiatrist Dr. Melissa Piasecki concerning her evaluation of Dempsey. (ECF Nos. 32-21 at 78-80; 33-1.)

The state district court found trial counsel's testimony more credible than Dempsey's. (ECF No. 33-6 at 6.) The district court denied Ground 1 of the state petition, which included claims that counsel was ineffective for failing to (1) adequately investigate

the case and discover that "federal law was broken" before Dempsey entered his guilty pleas; (2) offer mitigation evidence; (3) communicate with Dempsey adequately; (4) ensure Dempsey understood his constitutional rights; and (5) advise Dempsey not to appeal. (*Id.* at 7-9.) The state district court denied Ground 2, alleging Dempsey's right to cross-examination was violated because he was in a holding cell during his preliminary examination and was incompetent when he entered his pleas. (*Id.* at 9-10.) The state district court also denied the "supplemental claim" that Dempsey lacked the capacity to enter a knowing, voluntary and intelligent plea, and his waiver of preliminary examination was not knowingly entered. (*Id.*)

Dempsey filed a counseled appeal from the denial of the state petition, alleging only that the state district court erred (1) by finding counsel was not ineffective when he did not investigate whether Dempsey had the mental capacity to knowingly, intelligently, and voluntarily enter his guilty plea, and (2) finding Dempsey had the mental capacity to make a knowing, voluntary and intelligent decision to plead guilty. (ECF No. 33-19 at 7.) The Nevada Court of Appeals declined to consider the first claim raised on appeal because it was a "new argument not properly raised below" and otherwise affirmed the denial of relief. (ECF No. 35-8 at 3.)

## III.    LEGAL STANDARD

### A.    Voluntariness of Plea

The federal constitutional guarantee of due process requires a guilty plea be knowing, intelligent, and voluntary. *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). A defendant must be aware of the nature and elements of the charges against him, the constitutional rights he waives by pleading guilty, and possible punishment. *See Boykin*, 395 U.S. at 242-43. The record must demonstrate the defendant understands he is waiving his privilege against self-incrimination, his right to jury trial, and his right to confront his accusers. *See id*.

A defendant must be competent to enter a guilty plea. *See Godinez v. Moran*, 509 U.S. 389, 396 (1993). The test for competency to plead guilty is the same as that for a

defendant's competency to stand trial: whether the defendant comprehends the proceedings and has the ability to consult with a lawyer with reasonable understanding. *See Dusky v. United States*, 362 U.S. 402, 402 (1960) (stating the test for competency is whether defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him") (internal quotation marks omitted).

Addressing the standard applicable to the voluntariness of guilty pleas, the Supreme Court endorsed the following definition:

> [A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady*, 397 U.S. at 755 (citation and footnote omitted). "To determine the voluntariness of the plea, we look to the totality of the circumstances, examining both the defendant's 'subjective state of mind' and the 'constitutional acceptability of the external forces inducing the guilty plea.'" *Doe v. Woodford*, 508 F.3d 563, 570 (9th Cir. 2007). *See also Brady*, 397 U.S. at 749-51 (noting that "mental coercion" is found if the defendant "did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty" and a defendant might choose to plead guilty, e.g., to avoid a potentially harsher sentence if he were to lose at trial); *Doe*, 508 F.3d at 571 ("Any evidence of mental deficiencies did not undermine the voluntariness of Doe's plea even in light of the alleged limitation to two hours he claims he had to consider the proposed plea agreement.").

"[T]he representations of the defendant, his lawyer, and the prosecutor at [the original plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). "Solemn declarations in open court carry a strong presumption of verity." *Id.* "The subsequent presentation of conclusory allegations

1   unsupported by specifics is subject to summary dismissal, as are contentions that in the

2   face of the record are wholly incredible." *Id.*

3         **B.    Ineffective Assistance of Counsel ("IAC")**

4         "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it

5   promises only the right to effective assistance . . . ." *Burt v. Titlow*, 571 U.S. 12, 24 (2013).

6   An IAC claim requires a petitioner demonstrate (1) the attorney's "representation fell

7   below an objective standard of reasonableness[;]" and (2) the attorney's deficient

8   performance prejudiced the petitioner such that "there is a reasonable probability that, but

9   for counsel's unprofessional errors, the result of the proceeding would have been

10  different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "Unless a

11  [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from

12  a breakdown in the adversary process that renders the result unreliable." *Id.*

13        An IAC claim "must identify the acts or omissions of counsel that are alleged not

14  to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

15  A court considering an IAC claim, "must indulge a strong presumption that counsel's

16  conduct falls within the wide range of reasonable professional assistance; that is, the

17  defendant must overcome the presumption that, under the circumstances, the challenged

18  action 'might be considered sound trial strategy.'" *Id.* at 689. Thus, a court is obliged to

19  "determine whether, in light of all the circumstances, the identified acts or omissions were

20  outside the wide range of professionally competent assistance." *Id.* at 690. "In making

21  that determination, the court should keep in mind that counsel's function, as elaborated

22  in prevailing professional norms, is to make the adversarial testing process work," and

23  "counsel is strongly presumed to have rendered adequate assistance and made all

24  significant decisions in the exercise of reasonable professional judgment." *Id.*

25        "A fair assessment of attorney performance requires that every effort be made to

26  eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

27  challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

28  *Id.* at 689. Strategic choices made "after thorough investigation of law and facts relevant

to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

In establishing a reasonable probability the result of the trial would have been different, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). A petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687-88. A petitioner bears the burden to overcome the presumption that counsel made sound trial-strategy decisions. *See Harrington*, 562 U.S. at 104.

When applying *Strickland* to counsel's advice in plea negotiations, the voluntariness of the plea depends on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases." *Hill v. Lockhart*, 474 U.S. 52, 56, 59 (1985) (citing *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). When an IAC claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires the petitioner demonstrate "[t]here is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59. *See also Lafler v. Cooper*, 566 U.S. 156, 163 (2012) ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice.").

"Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee v. United States*, 582 U.S. 357, 369 (2017). To obtain relief, a petitioner must convince the court that a decision to reject the plea bargain would have

been rational under the circumstances. *See Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 486 (2000)). For purposes of an IAC claim, counsel has a critical obligation to advise the client of the "advantages and disadvantages of a plea agreement." *See id.* at 370 (quoting *Libretti v. United States*, 516 U.S. 29, 50-51 (1995)). However, "[t]he Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances"; rather, it "permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." *United States v. Ruiz*, 536 U.S. 622, 630-31 (2002) (citing examples such as a misapprehension of the quality of the State's case, likely penalties, admissibility of a confession, failure to anticipate a change in law regarding punishment, and counsel's failure to point out a potential defense and to find a potential constitutional infirmity in grand jury proceedings) (citations omitted).

### C.    Procedurally Defaulted IAC Claims

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). Where a petitioner fails to do so and thus "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

For claims of ineffective assistance of trial counsel, petitioners may establish cause to excuse their procedural default where (1) the claim of ineffective assistance of trial counsel is "substantial"; (2) the "cause" consists of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires an "ineffective assistance of

1  trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Trevino v.*

2  *Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 (2012)).

3       In *Martinez*, the Supreme Court cited the standard for issuing a COA as analogous

4  support for whether a claim is substantial. *See* 566 U.S. at 14. Under that standard, a

5  claim is substantial if a petitioner shows "reasonable jurists could debate whether (or, for

6  that matter, agree that) the petition should have been resolved in a different manner or

7  that the issues presented were 'adequate to deserve encouragement to proceed further.'"

8  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). An ineffective assistance of trial counsel

9  claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566

10 U.S. at 14-16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

11       "[T]he standard for evaluating the underlying trial counsel IAC claim during the

12 *Martinez* prejudice analysis is not as stringent as that required when considering the

13 merits of the underlying [*Strickland*] claim." *Leeds v. Russell*, 75 F.4th 1009, 1017-18 (9th

14 Cir. 2023) (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022) ("[A] conclusion on

15 the merits of [a trial counsel IAC] claim under *Strickland* holds a petitioner to a higher

16 burden than required in the *Martinez* procedural default context, which only requires a

17 showing that the [trial counsel IAC] claim is 'substantial.'")). While review of trial counsel's

18 actions in a *Martinez* prejudice analysis is conducted under a relaxed standard, the

19 *Strickland* standard is applied with full force when considering the actions of initial

20 postconviction review counsel under a *Martinez* analysis. *See Leeds*, 75 F.4th at 1022.

21       "The analysis of whether both cause and prejudice are established under *Martinez*

22 will necessarily overlap, 'since each considers the strength and validity of the underlying

23 ineffective assistance claim.'" *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019).

24 Review of the *Martinez* requirements is *de novo*. *See, e.g.*, *Detrich v. Ryan*, 740 F.3d

25 1237, 1246-48 (9th Cir. 2013); *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017).

26 **IV.    DISCUSSION**

27       In Ground 2 of the Petition, Dempsey alleges his trial counsel provided ineffective

28 assistance in violation of the Sixth and Fourteenth Amendments by pressuring and

influencing Dempsey to plead guilty involuntarily. (ECF No. 25 at 20-22.) He claims his guilty plea was involuntary because his counsel pressured him to plead guilty despite knowing Dempsey's mental deficits, and because of counsel's failure to investigate the case and communicate and explain documents, including the GPM.[4] (*Id.*) This Court previously deferred ruling, until its review of the merits, whether Dempsey can demonstrate cause and prejudice to overcome the procedural default of this claim under *Martinez.* (ECF No. 50 at 9.) Respondents contend Dempsey cannot establish cause and prejudice to overcome the procedural default because he cannot establish that trial counsel improperly pressured or influenced him to plead guilty involuntarily or that postconviction counsel was ineffective for failing to pursue the claim on appeal. (ECF No. 62 at 8-10.) As discussed below, Dempsey has not met his burden to overcome the procedural default under *Martinez*, as he has not established a substantial claim that trial

---

[4]In the counseled Petition, Dempsey asserts:

The pro se petition contains two claims:

1.  That Mr. Dempsey was denied his right to confront and cross examine his accusers, whose testimony would have been "useless in the case because of their age's." (E.C.F. No. 10.)

2.  That his attorney was ineffective because he failed to bring any mitigating evidence that would have helped his case, and because his attorney forced him to take the plea deal.

The latter pro se claim is really two different claims and will be addressed as such in this amended petition. The first pro se claim is realleged here but as undersigned counsel has no knowledge of the factual or legal basis for it, it will not be further addressed herein and will stand on its own.

(ECF No. 25 at 7.) The Court concludes the above statement that claim "1" "will stand on its own" is insufficient to raise that claim that Dempsey was denied his right to confront and cross examine his accusers. It will not be considered, as it is not set forth in the Petition in accordance with LR 15-1, which provides the following:

(a)    Unless the court orders otherwise, the moving party must attach the proposed amended pleading to a motion seeking leave of the court to file an amended pleading. The proposed amended pleading must be complete in and of itself without reference to the superseded pleading and must include copies of all exhibits referred to in the proposed amended pleading.

(b)    If the court grants leave to file an amended pleading, and unless the court orders otherwise, the moving party must then file and serve the amended pleading.

1 counsel's performance fell below an objective standard of reasonableness under

2 *Strickland* or a substantial claim there is a reasonable probability that, but for counsel's

3 actions, Dempsey would not have pleaded guilty and would instead have insisted on

4 going to trial.

### A.   Additional Background

#### 1.   Defense counsel's testimony[5]

7 At the state postconviction evidentiary hearing, defense counsel testified he

8 obtained discovery including social service records for the two child victims "to see what

9 kind of statements they were making to social workers and police, and how their

10 allegations were handled by that agency and see what corroborating or conflicting

11 evidence arose," compared to the police reports. (ECF No. 32-21 at 14.) Counsel "kept

12 an eye" on the preliminary hearing in the case against the codefendant, Herndon, "to see

13 what the allegations were against him and the degree to which the girls were alleging Mr.

14 Dempsey [sic] in the Herndon proceeding," because the codefendant's case "was a

15 barometer of how the Dempsey case might be expected to go generally." (*Id.* at 14-15,

16 30.) Counsel did not recall a lot of physical corroboration for the allegations against

17 Dempsey, but believed there may have been evidence of a sexually transmitted disease.

18 (*Id.*)

19 Counsel investigated defenses and obtained background information concerning

20 Dempsey, including social services, school, and mental health, records that indicated

21 Dempsey previously tested at an IQ level of 50 and 79, was diagnosed with sensory

22 integration disfunction now called sensory processing disorder, was socially awkward,

23 and had poor self-esteem. (*Id.* at 9-12, 15.) Counsel received a memo from an investigator

---

25 [5]The state district court found counsel's testimony more credible than Dempsey's testimony. (ECF No. 33-6 at 6.) That determination is presumed correct and has not been rebutted by a showing of clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). 26 *Pirtle v. Morgan*, 313 F.3d 1160, 1168 (9th Cir. 2002) (citing *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)) ("[U]nder AEDPA, factual determinations by the state court are 27 presumed correct and can be rebutted only by clear and convincing evidence."). Even assuming the presumption of correctness is inapplicable for purposes of *Martinez* 28 analysis, the Court finds no basis to disagree with the state district court's determination as Dempsey's testimony includes multiple instances demonstrating a lack of credibility.

that Dempsey, his brothers, and his mother, were described as "retarded," and Dempsey and his brothers "all had fetal alcohol issues." (*Id.*) Counsel investigated whether Dempsey was victimized in the foster care system. (*Id.*)

Counsel testified his conversations with Dempsey were "strained at times, but they were detailed" and counsel "eventually would get the information" that counsel was trying to obtain, or "the understanding [counsel] was trying to reach with him"; "[i]t just wasn't real quick like somebody who is high functioning." (*Id.* at 21-22.) Counsel said Dempsey acted in a way that made counsel "think a competency evaluation would be appropriate," as Dempsey "wasn't responding as well as he should have or could have," and "[t]here were other considerations including [counsel's] interaction with him vis a vis weighing the type of court proceedings and the pending offers and such." (*Id.* at 12-13.) Counsel would ask Dempsey to repeat himself because Dempsey is "very soft spoken." (*Id.* at 19.) Counsel was not sure if this was a cognitive issue, but "it [was] in the mix in [counsel's] mind." (*Id.*) Counsel was "not getting real detailed answers from" Dempsey and it was a "big case," where Dempsey was "looking at decades in prison." (*Id.*) Dempsey at one point stated there were bugs in his food and counsel did not know if that was a hallucination or bad food. (*Id.* at 19-20.) Counsel said, "Whenever I had interaction with him, I could interact, but I thought this is a big case, we'll get an eval done." (*Id.* at 18-19.) Counsel said he was "being careful" when he submitted the competency referral. (*Id.*)

Counsel acknowledged one competency evaluator reported, "[b]ased on his low functioning, knowledge and abstract reasoning ability demonstrated during the current interview, his intellectual ability appears to be in the low average range." (*Id.* at 20-21.) Counsel recalled the evaluators concluded Dempsey had "cognitive or function issues, but that he was legally competent." (*Id.* at 14.) Counsel said Dempsey "came back competent, and in my interactions with him, he was competent." (*Id.* at 18.) Counsel "compared these evals to being able to interact with him," and felt they could "go forward." (*Id.* at 22.)

17

Counsel spoke to Dempsey "quite a bit" about "the allegations," and met Dempsey "several times" at Justice Court. (*Id.* at 15, 24.) Co-Counsel and counsel's investigator also may have met with Dempsey. (*Id.* at 11, 24-26.) Counsel provided redacted reports to Dempsey, discussed portions with him, and had discussions about them. (*Id.* at 15.) Counsel went over the discovery with Dempsey, including police reports, social services documentation, the report of the children to social services to their personnel, medical examinations, sexual assault examinations for both children, interviews/statements of the children, and believed he either provided all of it to Dempsey or went over it with him. (*Id.* at 29-30.)

Dempsey was initially facing 35 years to life imprisonment on each count, i.e., the rest of his life in prison. (*Id.* at 27, 29.) Counsel said Dempsey "had questions, but he wasn't questioning the allegations." (*Id.* at 30.) Counsel said they had "a lot" of discussion about the elements of Child Sexual Assault and Lewdness with a Child Under 14 Years, and counsel believed Dempsey understood them. (*Id.* at 34-35.) Counsel said Dempsey admitted to counsel and the police that he did the things he was accused of doing and that over time their conversations focused on "minimizing his prison time rather than him believing the defense on the factual merits was going to work." (*Id.* at 30-31.) Counsel said Dempsey was frustrated because Herndon "was the worse guy so to speak, comparatively had done more." (*Id.* at 37.) Their discussions centered on Dempsey's desire for an opportunity to parole-out at some point. (*Id.* at 27.)

Defense counsel testified that, given the discovery, evidence the State might be able to present to a jury, and discussions with Dempsey, he concluded that, given the original charges, this was a case that should be resolved by plea negotiation rather than trial, but counsel "wanted it to be [Dempsey's] decision," and told Dempsey that if he goes to trial, "[y]ou are either going to win big or lose big, it is your choice." (*Id.* at 31-32.) Counsel said Dempsey's "mindset was I want to get out of prison one day, and I don't see going to trial is going to get me out of prison." (*Id.*) Counsel testified Dempsey was prepared to plead to four charges, but counsel advised him to wait to see if he received

a better offer, and when a better one was made, Dempsey was pleased and agreed to the consecutive sentences term because it was better than prior offers. (*Id.*)

Defense counsel testified that, prior to a client waiving preliminary hearing, it is his practice to explain to the client the constitutional rights the client is giving up by choosing to forgo the hearing and plead guilty. (*Id.* at 8.) Counsel said he recalled "going over" "beforehand" what would show up in the GPM during his explanation of the Waiver of Preliminary Examination because counsel recognized "there was some kind of mental health issue going on or cognitive issue with him" and it was counsel's usual practice to prepare the client "for what is going to be in the GPM and in the canvass." (*Id.* at 16-17.)

Counsel did not recall going over the GPM or reading the GPM to Dempsey aloud and said his general practice is to have his clients read it themselves and then ask if they understand it. (*Id.* at 16, 33.) Counsel usually explains the judge will ask if the defendant read and understands it, so counsel goes over the charge and advises defendants to be honest and tell the judge whether they committed the crime. (*Id.* at 33-34.) Counsel's usual practice is to "spot check" by asking the client whether the GPM states "pretty much what I told" them back "at the Justice Court," asks them to explain the penalty, or asks them to explain the negotiations. (*Id.*) Counsel said that if the minutes indicate he was present when Dempsey pleaded, then he "absolutely" went over the GPM with him in accordance with his usual practice. (*Id.*) Counsel testified that, as is his usual practice, he verbally explained to Dempsey he had a right to trial, confrontation, right to a jury, right to cross-examine witnesses, and the possible penalties, and that he would be giving up his rights if he pleaded guilty. (*Id.* at 32-34.) Counsel testified that when he showed up at sentencing, Dempsey said, "you lied to me," and would not specify what counsel did wrong or how counsel misled him. (*Id.* at 35-36.)

### 2.    Dempsey's testimony

Dempsey testified at the state postconviction evidentiary hearing that he lied to police when he admitted under threat to putting his penis inside of the victims. (*Id.* at 71.) He said the police threatened to make his life "a living hell" if he walked out of the

1   questioning room and the reason this is not reflected on the video of his interview is that
2   the police tampered with the evidence. (*Id.*) He did not relay this to his trial counsel. (*Id.*
3   at 71-72.) He claimed his admissions about sexually assaulting the victims to Parole and
4   Probation were lies made under threat from his cellmate who told him to "either write what
5   he told me to say or he would beat my ass." (*Id.*)

6          Dempsey testified his counsel never came to meet him at the jail, but he met with
7   counsel four or five times by video conference, three times at Justice Court, and when he
8   came to district court. (*Id.* at 42, 53-54.) He met the investigator twice at the jail and
9   telephoned the investigator more than counsel because the investigator "was the only
10  one that would answer his phone and explain certain things." (*Id.*) Counsel provided the
11  police report, and Dempsey "glimpsed through it," but Dempsey claimed counsel did not
12  provide the rest of his case file. (*Id.* at 46-48.)

13         Dempsey said he told counsel three times he did not want to take any plea deal,
14  including this deal, but counsel came back at him with the plea deal and told him he would
15  not win in trial due to Mr. Herndon's case. (*Id.* at 55.) Dempsey said he "didn't see any
16  other option except to plead guilty and make the State happy." (*Id.* at 55-56.) He "would
17  rather have gone to trial than plead guilty." (*Id.*)

18         Dempsey said his attorney did not explain a preliminary examination, what it meant
19  to waive preliminary examination, or what rights he would give up with the waiver. (*Id.* at
20  40.) Dempsey said he read and signed the waiver of preliminary examination but did not
21  know he was giving up his rights. (*Id.* at 40-41.) Dempsey testified that, when he read the
22  waiver of preliminary examination, he thought he faced "[t]hree ten to life's with the
23  possibility of parole after the first ten year sentence," and did not know what "consecutive"
24  meant as no one explained to him the difference between concurrent and consecutive
25  sentences. (*Id.* at 43-44.)

26         Dempsey testified counsel did not go over the GPM with him; rather, counsel gave
27  it to him and walked away to talk with the District Attorney. (*Id.* at 42, 50.) Dempsey said
28  he could read and write and could have understood the GPM had he not been too

stressed to read it, and that counsel did not help him. (*Id.* at 50-52.) Dempsey was "too worried about what was happening" to read the entire GPM and read only "to the second page." (*Id.*) When asked whether he told counsel he did not understand the GPM, Dempsey replied, "[a]ll [counsel] did was come back and told [sic] me to sign the paperwork." (*Id.*) Dempsey did not understand at the postconviction evidentiary hearing, why he was asked about the GPM as he believed "[t]hat has nothing to do with the case." (*Id.* at 74.)

Dempsey testified he told the state court he wanted to plead guilty and did not want to go to trial because counsel "forced" him into the plea deal and because he was "stressed out." (*Id.* at 55-56.) He said, because he was "confused and stressed out," he "just pled guilty," and told the court he agreed and understood the guilty plea because that's what he "thought was right," "[b]ecause I guess that is what the D.A. and my attorney wanted at the time," but he did not understand at the time. (*Id.* at 43, 58.) He claimed he told the state court he understood the plea negotiations, even though he did not, because counsel told him to agree to the plea deal. (*Id.* at 59-60.)

Dempsey testified he "sort of" understood he was guilty but he "didn't know what" he "was really pleading guilty to," and was not aware of the rights he gave up by pleading guilty. (*Id.* at 42-43.) He said he was waiving his right to trial and did not understand that he was not going to have a trial if he pleaded guilty, although he understood a trial meant that he was able to question his witnesses. (*Id.* at 65-66.)

Dempsey testified he did not understand that he was admitting the allegations of the victims or that he would be going to prison if he admitted those allegations. (*Id.*) He claimed the victims did not accuse him of "lewdness at all," and he lied when he told the court he did the things alleged in the Information, because he was doing what his attorney wanted him to do. (*Id.* at 69-70.)

Dempsey testified that, when he told the state court he read and understood the GPM, he "sort of" knew what it was but did not read the entire GPM. (*Id.* at 43, 63-64.) He claimed he agreed with the court's questions because he "thought it was the right thing

1   to do" "because she's the Judge and it is better to answer properly." (*Id.* at 43, 66.) He

2   testified that in retrospect he should have answered "yes," when the court asked him

3   whether there was anything about the charges he did not understand. (*Id.* at 68.)

4         Dempsey testified that when he pleaded guilty, he believed he would be eligible

5   for parole after 10 years. (*Id.*) He claimed he told the court he understood because he

6   "was just going with what [he] was being told." (*Id.* at 60.) He said that, at the time, he

7   trusted his counsel, and thought counsel was doing the right thing, but afterwards

8   Dempsey discovered counsel "wasn't the person that should have represented" him "in

9   the first place." (*Id.* at 60-61.) Dempsey testified he felt threatened into pleading guilty

10   because he came to believe counsel "used Mr. Herndon's Preliminary Hearing to make

11   the plea deal with" him, and counsel told him he would not win in trial due to what the girls

12   were saying in Mr. Herndon's case. (*Id.* at 44.)

13             **3.**    **Dr. Piasecki's testimony**

14         Forensic psychiatrist Melissa Piasecki examined documents concerning the case

15   and Dempsey's history and conducted a semi-formal evaluation that lasted 60-90

16   minutes. (ECF No. 33-1 at 5-6.) Piasecki did not conduct any tests. (*Id.*) Piasecki relayed

17   that Dempsey started elementary school when he was 6.5 years old, was twice held back

18   a grade, and was admitted to Special Education classes for learning disability. (*Id.*)

19   Dempsey was diagnosed with attention deficit hyperactivity disorder (ADHD) and other

20   learning disabilities related to verbal processing. (*Id.*)

21         Piasecki relayed that in 1989, Dempsey's overall IQ was measured at 79 and in

22   1992 it was measured at 84. (*Id.* at 7.) Piasecki said that for the latter, conducted by

23   Washoe County Psychological Service, Dempsey's verbal IQ was 75, meaning "below

24   average" and possibly a "significant impairment in the verbal ability." (*Id.* at 7-8.)

25         Piasecki relayed that Dempsey aged-out of high school at 20 years old with an

26   adjusted diploma due to his special education needs, and that he was receiving Social

27   Security disability and unable to work. (*Id.* at 9-10.) Piasecki relayed that the Northern

28   Nevada Mental Health Services diagnosed him with generalized anxiety disorder,

schizotypal personality disorder, which is a personality disorder with odd or unusual traits. (*Id.* 9.) Piasecki opined that although Dempsey does not have physical features associated with fetal alcohol exposure, his history of intellectual disability, specifically the learning disabilities, and ADHD symptoms, including impulsivity, and other deficits are consistent with fetal alcohol exposure and effects. (*Id.* at 11.)

Piasecki testified the competency evaluations indicate Dempsey was "at risk of not being competent or may have left competency." (*Id.* at 11-12.) She opined that "[t]he combination of long-standing disabilities, short-term or situation-bound anxiety and some of his personality qualities could have combined to make him unable to have a rational understanding of the agreement." (*Id.* at 12.) She stated that "[s]omeone with intellectual disabilities who is passive may agree to things without fully understanding what they're agreeing to," and it is "possible" that happened in Dempsey's case. (*Id.* at 12, 19.)

On cross-examination, Piasecki agreed that mental illness, ADHD, Fetal Alcohol Syndrome, and Schizotypal, do not alone support a finding of incompetency. (*Id.* at 22.) She testified she did not render an opinion whether Dempsey was competent at the time of her evaluation. (*Id.* at 23-24.) She agreed that Dempsey's co-occurring challenges, including Schizotypal Personality Disorder, could make him paranoid. (*Id.* at 25, 30

### B.    Analysis

As discussed, a defendant who pleads guilty upon the advice of counsel may only attack the voluntary and intelligent character of the guilty plea by showing the advice he received from counsel fell outside the range of competence demanded of attorneys in criminal cases. *See Hill*, 474 U.S. at 56-57. Dempsey fails to establish a substantial claim that trial counsel's performance and advice fell outside the range of competence demanded of attorneys in criminal cases as the record contemporaneous with the plea negotiations, execution of the GPM, and entry of pleas, belies a claim that counsel pressured or influenced Dempsey to accept the plea offer, and Dempsey fails to present evidence demonstrating counsel's actions, as opposed to the charges and evidence against him, pressured him to plead guilty.

### 1.    Failure to investigate

Dempsey has not presented any facts demonstrating that counsel's investigation fell outside the range of competence demanded of attorneys in criminal cases and the record belies that assertion. Trial counsel was aware that Dempsey had admitted to the police that he engaged in the conduct that was alleged by the victims and that Dempsey faced life imprisonment if convicted at trial. Counsel obtained discovery and investigated records regarding Dempsey and the victims for purposes of developing defenses. Counsel kept an eye on the codefendant's case, including the codefendant's Preliminary Examination, which, in addition to Dempsey's admissions to police, presented a barometer for the evidence that would be presented at a trial against Dempsey and would inform Dempsey's decision whether to plead guilty or go to trial.

### 2.    Failure to adequately communicate

Dempsey has presented no facts demonstrating that counsel's communication with Dempsey fell outside the range of competence demanded of attorneys in criminal cases and the record belies that assertion. Counsel was aware of Dempsey's cognitive challenges, and had challenges communicating with Dempsey, but counsel was able to do so—it just took a little longer than with other clients. Counsel obtained a competency evaluation out of an abundance of caution and the state court ruled Dempsey was competent, which matched counsel's experience with Dempsey. Counsel met Dempsey four or five times by video conference, in-person at least three times in the Justice Court, and in-person at the arraignment where Dempsey signed the GPM and entered his guilty pleas. Cocounsel and the defense investigator also met with Dempsey and Dempsey spoke with counsel by phone.

### 3.    Failure to explain the GPM

Dempsey fails to demonstrate a substantial claim that counsel failed to explain the GPM. The record shows defense counsel did not recall reviewing the GPM with Dempsey, did not sign the GPM, and neither the state court nor Dempsey confirmed counsel reviewed the GPM with Dempsey. However, Dempsey confirmed to his new counsel for

his motion to withdraw his guilty plea that he signed the GPM "after discussing the document with his counsel," and "[h]is then counsel answered all his questions about the document." Moreover, defense counsel testified he was aware of the possibility that Dempsey may have cognitive challenges and recalled explaining beforehand the terms of the anticipated GPM and corresponding plea colloquy when he advised Dempsey at the hearing in Justice Court when Dempsey waived preliminary examination. Counsel testified that, as is his usual practice, he verbally explained to Dempsey he had a right to trial, confrontation, right to a jury, right to cross-examine witnesses, and the possible penalties, and that he would be giving up his rights if he pleaded guilty. He discussed with Dempsey that the state court would ask Dempsey to admit the facts underlying the offenses at the later change-of-plea hearing. Counsel stated that, because the court minutes indicate counsel was present when Dempsey later pleaded, he "absolutely" went over the GPM with Dempsey in accordance with his usual practice.

The record shows that Dempsey confirmed during his plea colloquy and by the terms of the GPM that he read and understood the GPM. Dempsey also acknowledged he "reads and writes well," and new counsel stated in the MWGP that Dempsey "read paragraphs 6 and 7 aloud to [new counsel] and explained them both to [new counsel] in a way that indicated he had a clear understanding of their meaning." Dempsey testified at the postconviction evidentiary hearing that he did not read the entire GPM because he was too stressed out to read all of it and that he only read the first two pages. However, the state court also went over the rights Dempsey gave up by pleading guilty, that he would be eligible for parole in 30 years if the court followed the sentencing stipulation, and the state court had the facts underlying the offenses read out loud to Dempsey before eliciting Dempsey's confirmation that he "did" the actions alleged against him as read out loud to him. Even assuming the above facts fail to demonstrate counsel adequately explained the GPM to Dempsey, including as Dempsey asserted the meaning of "consecutive," they demonstrate Dempsey was well-aware of the terms of the GPM and consented to them in writing and verbally in court without reservation. Thus, he fails to

establish a colorable claim that, but for counsel's failure to specifically review the GPM, Dempsey would not have pleaded guilty and would have insisted on going to trial.

### 4.    Pressure and influence

Dempsey presents no facts demonstrating counsel pressured him to plead guilty involuntarily or that counsel's advice to accept the plea offer fell outside the range of competence demanded of attorneys in criminal cases. Given Dempsey's confessions to the police, discovery, and the codefendant's proceedings, counsel concluded the case was better resolved by plea than trial, but counsel "wanted it to be [Dempsey's] decision," and told Dempsey that, if he goes to trial, "[y]ou are either going to win big or loose [sic] big, it is your choice." Counsel explained that Dempsey focused on "minimizing his prison time rather than him believing the defense on the factual merits was going to work." And Dempsey's "mindset was I want to get out of prison one day, and I don't see going to trial is going to get me out of prison," so they focused on a sentence that would allow Dempsey the possibility of paroling-out.

Counsel testified Dempsey was prepared to plead to four charges and was pleased when the State offered an agreement to plead to only three counts because, even with the stipulated consecutive sentence, the offer was better than prior offers. Dempsey testified that counsel told him he would not win in trial due to the codefendant's case and, although Dempsey would have preferred to go to trial, Dempsey "didn't see any other option except to plead guilty . . .." New counsel for the Motion to Withdraw Plea stated he read the discovery and believed the plea bargain was in Dempsey's best interest given the evidence the State could have presented against Dempsey at a trial. By signing the GPM, and during his change-of-plea hearing, Dempsey acknowledged that, under his agreement, he would be eligible for parole after 30 years.

Dempsey also signed the GPM, acknowledging his plea was offered "freely, voluntarily, knowingly and with full understanding of all matters set forth in the Information and in the [GPM]." He acknowledged "My plea of guilty is voluntary and is not the result of any threats, coercion or promises of leniency." He acknowledged "I am signing this

1   Plea Memorandum voluntarily with advice of counsel, under no duress, coercion, or

2   promises of leniency." At the change-of-plea hearing, Dempsey confirmed no one made

3   any threats to get him to enter the pleas, no one made any statements to get him to enter

4   the pleas that he did not tell the court about, and he had no basis for entering the pleas

5   other than that he committed the offenses charged, and decided to go forward and enter

6   the pleas of his own free will. Dempsey's later claims that he lied to the court and that he

7   did not understand what he signed or what he consented to in court lack credibility as he

8   admitted he would have understood the terms of his plea agreement had he bothered to

9   read the entire agreement and his admission that he should have spoken up to the trial

10  court if he did not understand his agreement and the significance of his guilty pleas.

11      Dempsey's claim that trial counsel was ineffective because counsel pressured or

12  influenced Dempsey to accept the plea bargain and enter guilty pleas is insubstantial as

13  it is wholly without merit.[6] *See Martinez*, 566 U.S. at 14-16.

14      In sum, the record supports the conclusion that Dempsey was aware of the nature

15  and elements of the charges against him and the constitutional rights that he was waiving,

16  including the right to a jury trial, the right against self-incrimination, and the right to

17  confront and cross-examine witnesses. The record demonstrates Dempsey did and

18  could, in accordance with counsel's assistance, rationally weigh the advantages of going

19  to trial against the advantages of pleading guilty, and that counsel advised him of the

20  advantages and disadvantages of trial verses accepting the plea offer. Facts

21  contemporaneous with the execution of the GPM and entry of guilty pleas do not show

22

23      [6]In his Reply, Dempsey makes several new claims of ineffective assistance of trial
   and postconviction counsel that were not raised in the Petition. (ECF No. 65 at 7-8.) The
   Court declines to consider new claims raised for the first time in a counseled reply brief.

24  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not
   consider arguments raised for the first time in a reply brief."); *Cacoperdo v. Demosthenes*,

25  37 F.3d 504, 507 (9th Cir. 1994). *See also Novosteel SA v. U.S., Bethlehem Steel Corp.*,
   284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Reply briefs *reply* to arguments made in the

26  response brief—they do not provide the moving party with a new opportunity to present
   yet another issue for the court's consideration."); *id*. (holding that, because the non-

27  moving party ordinarily has no right to respond to the reply brief, as a matter of litigation
   fairness and procedures, the new argument raised in the reply brief was necessarily

28  treated as waived); LR 7-2(b) ("Surreplies are not permitted without leave of court;
   motions for leave to file a surreply are discouraged.").

that constitutionally unacceptable external forces induced the guilty pleas. The circumstances demonstrate the decision to accept the plea agreement was rational, and there is no basis to conclude that rejection of the plea bargain was rational under the circumstances. Dempsey's claims, made after the entry of his pleas, that counsel's failure to investigate, communicate, explain the GPM, and pressure to plead guilty, are conclusory, unsupported by specifics, and wholly lack credibility in the face of the record. *See Blackledge*, 431 U.S. at 73-74.

Even assuming Dempsey has established a substantial claim of deficient performance, he fails to establish any facts that would support a determination that there is a reasonable probability he would have insisted on going to trial rather than accept the plea offer and plead guilty. Dempsey thus fails to demonstrate a substantial claim that counsel's actions fell outside the range of competence demanded of attorneys in criminal cases or, but for counsel's alleged failures, there is a reasonable probability Dempsey would have not pleaded guilty and would have insisted on going to trial. Accordingly, Dempsey fails to establish cause to overcome the procedural default of Ground 2 and Ground 2 is dismissed with prejudice. *See Martinez*, 566 U.S. at 14-16.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Petitioner. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a COA. Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA is only appropriate when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this

1   Court's procedural ruling was correct. *See id.* Applying these standards, a COA is not

2   warranted for Ground 2.

3   **VI.    CONCLUSION**

4         The Court notes that the parties made several arguments and cited to several

5   cases not discussed above. The Court has reviewed these arguments and cases and

6   determines that they do not warrant discussion as they do not affect the outcome of the

7   issues before the Court.

8         It is therefore ordered that Ground 2 of Petitioner's second amended petition (ECF

9   No. 25) is dismissed with prejudice as procedurally defaulted.

10        It is further ordered that the second amended petition (ECF No. 25) is denied.

11        It is further ordered that all requests for an evidentiary hearing are denied.

12        It is further ordered that a certificate of appealability is denied for Ground 2.

13        The Clerk of Court is further directed to (1) substitute Nathanjah Breitenbach for

14  respondent Warden Garrett; and (2) enter judgment accordingly and close this case.

15        DATED THIS 2nd Day of May 2025.

16

17   _____

18   MIRANDA M. DU
     UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28